*971 CHEN, Circuit Judge,
dissenting-in-part.
I join the majority opinion except for Part II.A.2, which reverses the district court’s conclusion that Appellants failed to meet their burden of proving that the prior art rendered the '029 patent obvious by Johnstone, either alone or in combination with the '819 patent. In my view, John-stone’s teachings are simply too vague and equivocal to justify invalidating the patent. Therefore, I respectfully dissent.
To begin with, issued patents enjoy a presumption of validity, which can only be rebutted by clear and convincing evidence. Microsoft Corp. v. i4i Ltd. P’ship, — U.S. -, 131 S.Ct. 2238, 2245-46, 180 L.Ed.2d 131 (2011). A party challenging a patent’s validity must do so with “evidence which produces in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are highly probable.” Buildex Inc. v. Kason Indus., Inc., 849 F.2d 1461, 1463 (Fed.Cir.1988) (citing Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984)). This is not a burden that is easily satisfied.
Moreover, the majority relies heavily on Johnstone alone, but the Patent Office specifically considered that reference during the prosecution of the '029 patent and came to the same conclusion that the fact-finder did below: Johnstone does not render the claims obvious. As a reviewing court, we should be particularly careful before overturning the verdict under these circumstances. See Tokai Corp. v. Easton Enterprises, Inc., 632 F.3d 1358, 1367 (Fed.Cir.2011) (explaining that the burden of proof to invalidate a patent claim is more difficult to meet when the challenge is based on the same prior art considered by the Patent Office during examination).
The majority is correct that Johnstone contemplates a large class of prostaglan-dins—the 17-phenyl PGF2 analog compounds—citing latanoprost in particular, for treating hair loss. But that reference does not teach or sufficiently suggest using a prostaglandin with a saturated (i.e., single) C5—C6 bond on the alpha chain, as claimed in the '029 patent. Instead, John-stone serves up a menu of seemingly unlimited possibilities. For example, when it comes to the alpha chain, Johnstone states that the good ones are those characterized by “the presence or lack of various modifications of the alpha chain.” J.A. 2293. Then, for the omega chain, Johnstone again states that preferred prostaglandins are those characterized by the “presence or lack of modifications to their omega chain.” Id. Such a broad, generic disclosure would appear to cover almost any conceivable prostaglandin. And among a variety of other possible modifications for the chains, Johnstone vaguely states that the alpha chain “could preferably be a C6-C10 chain which can be either saturated or unsaturated, having one or more double bonds, and alienes or a triple bond.” J.A. 2293. This lone sentence does not provide a sufficient blaze mark for using a saturated Cg—Cg bond. For the same reason that I agree with the majority that Johnstone does not anticipate the claimed compounds—it does not “clearly and unequivocally” disclose a compound with a saturated Og—Cq bond—I would find that it does not suggest one either. The specification contains no other language or examples of saturated alpha chains and certainly no references to saturating the specific bond at issue. The dozens of figures and summary of the invention only depict an unsaturated (i.e., double) C5-C6 bond, and John-stone’s claims cover only compounds with this bond. The steady and persistent message from the entirety of Johnstone’s teachings is clear: when it comes to the C6 —C6 bond, keep it unsaturated.
*972 Also, as the majority recognizes, the patentee amended the claims during prosecution to add a proviso carving out the Johnstone compounds, which resulted in a notice of allowance. The notice of allowance even pointed out that the amended claims were not obvious over Johnstone:
The prior art teaches the use of prosta-glandins for treating hair loss (see for example, WO 98/33497 [Johnstone]). However, the prior art lacks motivation to modify the prostaglandins taught therein in order to obtain the presently claimed prostaglandins, and thus, does not teach or suggest the presently claimed invention.
J.A. 5564. In light of the particularly heavy burden to show obviousness over a reference disclosed during prosecution and discussed by the examiner, Appellants have not shown that Johnstone now somehow teaches or suggests the very structural feature that the patentee claimed to distinguish the Johnstone compounds.
Nothing in the record compels a different result. Allergan’s expert, Dr. MacDonald, testified that a person of ordinary skill would not have saturated Johnstone’s C5-C6 double bond because “[i]t was considered to be a very important parameter in binding to the FP receptor.” J.A. 1773. Prostaglandins bind to receptors on the surface of cells, and that binding creates a signal to the cell to change its properties or functions. At the time of invention, it was well-understood that identifying which receptors a prostaglandin can bind to is key to designing a drug that affects the cells. See J.A. 23 (“Studying receptors is central to pharmacology—the science of drug therapeutics—because knowing what receptors are associated with a biological effect aids in designing a drug to [bind to] those receptors and produce or inhibit that effect.”). And, at that time, the state of the art suggested that saturating the CB-C6 bond in Johnstone’s compounds would have destroyed the critical binding property of the compounds. Id. at 30 (“Before [the inventor of the '029 patent] discovered] that saturated prostaglandin F analogs could bind, this double bond was thought vital for FP-receptor binding.”). The '029 patent’s compounds have saturated C6-C6 bonds but do, in fact, bind to the FP-receptor (contrary to popular belief at the time), which further suggests nonobvi-ousness. See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1326 (Fed.Cir.2009) (“An inference of nonobviousness is especially strong where the prior art’s teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements.”). The majority finds no clear error in the district court’s acceptance of this undisputed fact for purposes of anticipation. See Majority Op. at 959. I would also find that the district court correctly concluded that it would not have been obvious to a person of ordinary skill at the time of invention to change the unsaturated C5-C6 bond in Johnstone’s compounds to a saturated bond. See DePuy, 567 F.3d at 1326 (suggesting nonobviousness “if the prior art indicated that the invention would not have worked for its intended purpose or otherwise taught away from the invention”); Eli Lilly & Co. v. Zenith Goldline Pharm., Inc., 471 F.3d 1369, 1378 (Fed.Cir.2006) (holding prior art supplied no motivation to modify compound to include claimed structural features because no reasonable expectation of success).
This is not a situation in which there are a finite number of identified, predictable solutions. See KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398, 421, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). Rather, the single sentence in Johnstone actually proposes hundreds of thousands, or even millions, of *973 variations on the alpha chain.[1] Cf. Eli Lilly, 471 F.3d at 1376 (prior art reference that disclosed millions of compounds did not spell out “a definite and limited class of compounds that enabled a person of ordinary skill in the art to at once envisage each member of this limited class”). The compound in Johnstone could have a saturated bond at any position on the alpha chain, an unsaturated bond at any position, a triple bond at any position, or even a combination of any of these bonds. As a result, a person of ordinary skill in the art was not faced with a “small or easily traversed” number of options based on Johnstone. See Bayer Schering Pharma AG v. Barr Labs., Inc., 575 F.3d 1341, 1347 (Fed.Cir.2009) (“[A]n invention would not have been obvious to try when the inventor would have had to try all possibilities in a field unreduced by direction of the prior art.”). In this instance, covering everything effectively tells us nothing. See Bayer, 575 F.3d at 1347 (“When what would have been obvious to try would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful an invention would not have been obvious.”) (internal quotations omitted).
The majority further reasons that it would have been obvious to select the claimed compounds because they, like Johnstone’s compounds, also “exhibit high pharmacological activity and no or very small side effects.” Majority Op. at 964. But the fact that we now know that the claimed compounds contain highly desirable properties should not compel us to conclude that this would have been obvious at the time of invention, especially when there is no expert testimony or other evidence in the record supporting the notion that it would be obvious to treat hair loss using any prostaglandin that exhibits “high pharmacological activity.” See Sanofi-Synthelabo v. Apotex, Inc., 550 F.3d 1075, 1088 (Fed.Cir.2008) (“Only with hindsight knowledge that the dextrorotatory enan-tiomer has highly desirable properties, can Apotex argue that it would have been obvious to select this particular racemate and undertake its arduous separation.”).
I also depart from the majority’s combination of Johnstone with the '819 patent. Following the Appellants’ argument, the majority links Johnstone’s methods of treating hair loss and the '819 patent’s methods of treating glaucoma by looking to the vasodilation properties shared by the compounds in those references. Majority Op. at 963-64. I find Johnstone’s discussion of vasodilation too ambiguous to amount to a clear motivation to combine.
For example, Johnstone states that “PGF2 alpha analogs can cause a vasodilation effect and through that mechanism may provide enhanced perfusion to the region of the hair bulb and thus stimulate increased trophic activity in the hair follicles.” J.A. 2291-92 (emphasis added). That Johnstone frames his vasodilation theory in somewhat uncertain terms (“may”) is not surprising since he later acknowledges that his representative pros-taglandin derivative, latanoprost, “was specifically tailored to eliminate ... vasodilation.” Id. at 2290. Ultimately, Johnstone surmises that there are “several possible *974 mechanisms that may individually or in concert explain the altered growth pattern of hair follicles observed in the current clinical study.” Id. at 2291. This level of uncertainty in Johnstone cannot then establish motivation to combine with the '708 patent and then with '819 patent. Unlike the Brandt references, which suggested that bimatoprost could be used to grow hair, the '708 and '819 patents have nothing to do with hair growth. These patents concern treatment methods for glaucoma. Appellants have not established by clear and convincing evidence that’ a person of ordinary skill in the art would look to these references for solutions in the hair growth field. This is especially true when the correlation between vasodilation and hair growth—the alleged link between Johnstone and the '819 patent—is so speculative. See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1376 (Fed.Cir.2011) (reference’s discussion of what “might” or “may” or “seems” to lead to nitrite and TSNA production does not suggest obviousness).
Appellants further assert that one of ordinary skill in the art would use the compounds disclosed in the '819 patent with Johnstone’s method of stimulating hair growth because Johnstone refers to the '708 patent, which is the parent of the '819 patent.
But Johnstone’s link to the '819 patent via the '708 patent is tenuous at best. Johnstone describes “preferred derivatives” for hair growth as those compounds lacking a phenyl ring structure in their omega chains, such as those described in the '708 patent. J.A. 2298. Any motivation to combine Johnstone with the compounds of the '819 patent via the '708 patent is then confined to those compounds lacking a phenyl ring structure. The '819 patent, however, teaches bimatoprost, which has a phenyl ring structure in its omega chain. Thus, as the majority concedes, “the list of compounds expressly disclosed [in Johnstone] as being vasodila-tory in the '708 patent exclude the 17-phenyl PGF analogs that the '819 patent discloses.” Majority Op. at 964 n. 8. Consequently, Johnstone’s reference to the '708 patent simply does not amount to a motivation to combine Johnstone with the '819 patent.
It is undisputed that the field of hair growth is “unpredictable and mysterious.” See J.A. 38. The majority errs in minimizing this unpredictability. Majority Op. at 965 (“But, it does not matter whether hair growth is generally an unpredictable endeavor. ...”). Our case law makes plain: unpredictability is a factor. Eisai Co. Ltd. v. Dr. Reddy’s Labs., Ltd., 533 F.3d 1353, 1359 (Fed.Cir.2008) (“To the extent an art is unpredictable, as the chemical arts often are ... potential solutions are less likely to be genuinely predictable.”). In light of our case law and the unpredictability of hair growth, Appellants have not satisfied their burden of showing clear and convincing evidence of obviousness.
Accordingly, looking at the evidence of obviousness as a whole, I would find that the district court did not clearly err in holding the asserted claims of the '029 patent nonobvious. For these reasons, I respectfully dissent.

. To the extent that the majority maintains that Johnstone does not cover thousands of possibilities, Majority Op. at 965, I respectfully disagree. True, Johnstone reaches specific classes of compounds, but Johnstone’s suggested modifications, which the majority relies on, cover many more variations.