REYNA, Circuit Judge,
concurring-in-part and dissenting-in-part.
I.
The Smartphone has defined modern life. Be it in the workplace, the home, airports, or entertainment venues across America, individuals are tethered to them handheld devices. Not long ago, users primarily spoke into these devices. Today, fingers tapping, grazing, pinching, or scrolling the screen is a ubiquitous image that reflects how we conduct business, work, play, and live. The asserted patent in this case is an invention that has propelled not just technology, but also dramatically altered how humans across the globe interact and communicate. It marks true innovation.
Today the majority invalidates seven claims in United States Patent No. 7,633,-607 (the '607 Patent) based on prior art that would not enable one of skill in the art at the time of the invention. In concluding that the Perski '455 prior art reference can be backdated to claim priority to the provisional application, the majority misapplies our requirement that the earlier disclosure comply with § 112 ¶ 1. Given the critical differences between the provisional and non-provisional disclosures, I would reverse the ITC’s finding that Perski '455 is entitled to the Perski '808 priority date and remand for additional proceedings.
On the issue of obviousness, rather than adopting the ITC’s determination that the *1369 SmartSkin prior art reference would have motivated one of skill in the art to combine mutual capacitance technology with transparent screens, I would hold as a matter of law that the asserted claims are not obvious.
I join the majority in concluding that the ITC erred in making an obviousness determination without fully considering evidence pertaining to industry praise, copying, and commercial success, but I write separately to discuss my views as to the purpose and function of objective indicia of nonobviousness as indicators of innovation in the relevant field.
I join the remainder of the majority opinion, including treatment of arguments relating to non-infringement of U.S. Patent No. 7,812,828, construction of the claim term “mathematically fitting an ellipse,” and the reasoning concluding that neither SmartSkin nor Perski '808 anticipate claim 10 of the '607 Patent.
Apple characterizes its invention as the first transparent, full image touchscreen that accurately detects and responds to multiple touches at once. More precisely, the asserted claims of the '607 Patent generally disclose a touch panel having a transparent capacitive sensing medium[1] configured to detect multiple, co-occurring touches at different locations to produce signals representative of the location of the touches. The touch panel, embodied in the marketplace as the interactive screen of an iPhone or iPad, is comprised of two layers of transparent electrically-isolated conductive lines where the two layers are spatially separated from each other and where conductive lines in one layer are positioned transverse to the conductive lines in the other layer, creating an array of intersection points. The images included below illustrate that the claimed detection and response to touch occurs through a “mutual capacitance” circuitry measuring the change in voltage between a horizontal wire and a vertical wire when a finger approaches a crossing point on the screen. See '607 Patent col. 9 11. 52-62.
*1370 [[Image here]]
It is the specially configured capacitive monitoring circuitry that detects changes in the capacitance between the two layers of conductive lines, indicating the location of the multiple touches on the touch panel. The patent enabled the multitouch technology and the transparent screen(s) into a device that fits the palm of a hand,
With this background in mind, I examine the claims of the '607 Patent alongside the prior art and a powerful record demonstrating Apple’s technical and commercial achievement.
II.
The majority adopts the ITC’s conclusion that Perski '455 discloses all the limitations of claims 1-7 in the '607 Patent. In finding that substantial evidence supports anticipation, the majority misconstrues a simplistic method for scanning a grid as a disclosure that would enable one of skill in the art to detect multiple finger touches. See Maj. op. 7-8. The majority finds that the provisional patent application in Perski '808 provides adequate support for Perski '455, but fails to assess whether the provisional application describes how to make and use multiple finger detection “in clear, concise, and exact terms.” New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1295 (Fed.Cir.2002) (quoting statute). I dissent from the majority’s conclusion that Perski '455 is prior art to the '607 Patent.
A.
The Perski inventors initially filed a provisional patent application—Perski '808— on February 10, 2003. The non-provisional Perski '455 application was later filed on January 15, 2004. During the 11 months between the time the provisional and non-provisional applications were filed, the inventors continued to refine the invention, as reflected in the extensive revisions made in filings with the PTO. Those revisions clearly show that in filing for Perski '455, language from the provisional was removed and new language was added. Apple emphasizes the breadth of the inventors’ revisions by constructing a red- *1371 line[2] comparing the language of the provisional application in February 2003 and the language of the non-provisional application in January 2004:
[[Image here]]
J.A. 6857 (excerpted portion).
Motorola argues that Perski '455 is entitled to the February 2003 priority date because the Perski '808 provisional application provides written description support for the claimed invention. On this point, the Administrative Law Judge agreed, finding that the Perski '808 provisional application sufficiently disclosed the finger detection method and described algorithms for use with transparent mutual capacitance.
Apple contends that Perski '455 is not entitled to the earlier priority date because there is no clear and convincing evidence that Perski '808 satisfied the written description requirement. Apple submits that the provisional application lacked enabling disclosures because it was not until Perski '455 was filed in January 2004 that the inventors disclosed how the screen recognized multiple finger touches.
Apple also argues that the reference is not anticipatory because there is testimony that the '607 Patent was conceived of between September 2003 and November 2003-ie., before the Perski '455 application.[3] See J.A. 8728-29. The Administra *1372 tive Law Judge never considered Apple’s evidence of an earlier conception date because he was satisfied that Perski '455 was entitled to the earlier priority date. J.A. 182 (declining to make any findings on Apple’s date of invention). On appeal, Apple seeks review of the Administrative Law Judge’s decision regarding the Perski '455 priority date and his failure to address the conception date for the '607 Patent.
B.
In section § 119(e)(1) of the Patent Statute, a non-provisional utility patent application may be afforded the priority date of a related provisional application if the two applications share at least one common inventor and the written description of the provisional application adequately supports the claims of the non-provisional application. To backdate the later application with the earlier priority date, the specification of the provisional application must “contain a written description of the invention” as defined in § 112 ¶ 1. New Railhead Mfg., L.L.C., 298 F.3d at 1295 (discussing 35 U.S.C. § 119(e)(1) and 35 U.S.C. § 112 ¶ 1).
My review of the differences between the Perski '808 application and the Perski '455 application leads me to determine that the prior application does not “clearly conclude” that the Perski inventors possessed the claimed invention as of February 10, 2003. Trading Tech. Int’l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1359 (Fed.Cir.2010) (quoting Lockwood v. Am. Airlines, 107 F.3d 1565, 1572 (Fed.Cir.1997)). In brief, Perski 455 should not have been awarded the earlier provisional application date because Perski '808 does not indicate that the inventors knew how to detect multiple touches in February 2003.
As filed, the provisional application discusses finger detection as a “goal,” with the goal being “to recognize all of the sensor matrix junctions that bypass signals due to external finger touch.” J.A. 16152. Recitation of a goal, however, is not sufficient if the corresponding steps are not disclosed. The majority credits the incomplete discussion of scanning the nodes of a matrix as satisfying the written description requirement without explaining how such a reference would put the Perski inventors in possession of the method for recognizing multiple finger touches and then generating the appropriate output signal. Maj. Op. 7. Indeed, the n*m “algorithm” discussed and heavily relied on in the majority’s rationale is no more than the scanning of nodes in a matrix where n corresponds to columns and m corresponds to rows.[4] I cannot agree that scanning a matrix is the same as teaching detection of multiple finger touches.
In January 2004, Perski '808 did not sufficiently explain how the multipoint detection would occur. J.A. 16152. It was not until Perski '455 that the inventors set forth a critical passage confirming that the initial goal had been met and “procedures for detection” were now “possible”:
In fact, because it is typically necessary to repeat the procedure for the second axis so the number of steps is more typically 2*n*m steps. However, this method enables the detection of multiple *1373 finger touches. When an output signal is detected on more then [sic ] one conductor that means more than one finger touch is present. The junctions that are being touched are the ones connecting the conductor that is currently being energized and the conductors which exhibit an output signal.
J.A. 16610 at col. 14 11. 35-43 (emphasis added); J.A. 6857 (indicating through color designations that the “output signal” language was not present in the Perski '808 application).
The record reflects that the 2*n*m scanning method “enabling the detection of multiple finger touches” was absent in February 2003 and the provisional application was limited to the simplistic n*m method which by itself merely describes the existence of a grid—ie., intersection lines parallel to each other. Because the disclosure in Perski '808 would not convey to a skilled artisan that the detection of an output signal on more than one conductor corresponds to multiple touches, I would reverse the ITC’s finding that Perski '455 is entitled to the Perski '808 priority date. I would thus remand for additional proceedings determining Apple’s conception date and whether, based on the newly developed record, Perski '455 qualifies as § 102(e) prior art.
III.
In addressing whether the claims of the '607 Patent are obvious, the majority endorses the ITC’s underlying findings regarding scope and content of the prior art—leaving for another day resolution of the ultimate legal question of obviousness. Maj. Op. 18. I would decide the issue and reverse the ITC’s determination that SmartSkin, alone or in combination with Rekimoto '033,[5] would have motivated one of skill in the art to combine mutual capacitance technology with transparent screens.
The asserted claims and the SmartSkin prior art are addressing two separate problems with two separate solutions. Prior to Apple’s invention, it was known how to achieve multitouch functionality on opaque surfaces and it was known how to achieve a transparent screen with single touch. But, a transparent touchscreen that accurately detected and responded to simultaneous multiple touches remained elusive.
The record shows that after Steve Jobs charged Apple’s engineers with the seemingly unachievable task of solving the multitouch problem, Apple explored adapting the primitive mutual capacitance system disclosed in SmartSkin to a novel system operating with transparent electrodes. The undertaking was fraught with technical challenges and ultimately proved that the incomplete guidance of the SmartSkin prior art contradicts the ITC’s finding that SmartSkin would provide one of skill in the art with a “reasonable expectation of success.” J.A. 523. SmartSkin, discussing surface-finger interactions through a mutual capacitance system, was focused on opaque prototypes such as interactive tables or walls. SmartSkin did not share Apple’s focus of making a smaller, transparent screen interactive; rather, the grid of copper electrodes detected touch on two sizeable systems much larger than a handheld device or tablet: an 80 x 90 cm plywood table and a 32 x 24 cm gesture *1374 recognition pad. In my view, the prior art reference cannot be clear and convincing evidence of obviousness where, as here, it does not guide a skilled artisan towards a particular solution. Bayer Sobering v. Barr Laboratories, Inc., 575 F.3d 1341, 1347 (Fed.Cir.2009); see also Unigene Laboratories, Inc. v. Apotex, Inc., 655 F.3d 1352, 1361 (Fed.Cir.2011) (declining to find a claim obvious when the when prior art does not provide “indication of which parameters were critical” or “direction as to which of many possible choices is likely to be successful”).
There is no basis to conclude that SmartSkin would teach a skilled artisan the foresight to realize Apple’s desired solution when the SmartSkin authors conceded that they did not know how to accomplish a multitouch screen with transparent electrodes. In the “Future Work” section, the SmartSkin authors muse that such a combination is possible, but they lacked the know-how to implement the very technology Apple sought:
This work is still at an early stage and may develop in several directions. For example, interaction using multiple fingers and shapes is a very new area of human-computer interaction, and the interaction techniques described in this paper are just a few examples. More research is needed, in particular, focusing on careful usability evaluation.
J.A. 13603 (emphases added). In light of the clearly stated uncertainty expressed by the SmartSkin authors that they could achieve a transparent touchscreen and that experimentation was still necessary to pursue the desired result, it was error to rely on SmartSkin to demonstrate that Apple’s invention was a “predictable solution” or “an anticipated success.” Rolls-Royce, PLC v. United Techs. Corp., 603 F.3d 1325, 1339 (Fed.Cir.2010).
I note with great interest that the majority, in its anticipation discussion, recognizes that the SmartSkin authors “had not achieved a touchscreen employing transparent electrodes.” Maj. Op. 1364. In discussing the disparities between the teachings in SmartSkin and those in the '607 Patent, the majority goes on to observe that SmartSkin provides “no disclosure that the authors had achieved a transparent touch screen and the record does not indicate that it would have been routine to do so. Nor is there any disclosure in SmartSkin that the matrix of ITO electrodes would have created the “transparent ... layer[s] recited in claim 10.” Maj. Op. 1364. The majority’s anticipation discussion supports a finding of nonobviousness by pointing out that the prior art authors did not know how to achieve a transparent touchscreen and acknowledging that the skilled artisan would have numerous design decisions to make and/or obstacles to overcome even after consulting the prior art. While the type of hope discussed in SmartSkin can be said to drive science, it should not without caution be embraced as an impediment to actual innovation.
Obviousness is not shown when prior art gives only “general guidance as to the particular form of the claimed invention or how to achieve it.” In re Rosuvastatin Calcium Patent Litigation, 703 F.3d 511, 518 (Fed.Cir.2012) (quoting In re O’Farrell, 853 F.2d 894, 903 (Fed.Cir.1988)). In this case, SmartSkin does not amount to clear and convincing evidence because the prior art references lack satisfactory guidance as to how to transform the screen of a handheld device into an interactive surface reacting to simultaneous multiple touches of a user’s fingertips. Contrary to the ITC’s conclusion that the asserted claims amount to no more than mechanical rearrangement of known pieces, the evidence supports that Apple, after identifying a problem pervading the prior art, succeeded in forging through obstacles to *1375 develop the solution. Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1377 (Fed.Cir.2012) (citing Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). Because I believe that the record compels a legal conclusion that the asserted claims are not obvious, I dissent from the decision to remand the issue back to the ITC.
IV.
In finding that the ITC erred in assessing whether the asserted claims were obvious, the majority focuses on the objective evidence of nonobviousness, often referred to as “secondary considerations.” See Graham, 383 U.S. at 36, 86 S.Ct. 684. The majority correctly points to the ITC’s failure to follow precedent and reach an obviousness conclusion after weighing all evidence on both sides. Maj. Op. 1365. I agree with the majority that the ITC erred in not analyzing objective evidence of industry praise, copying, and commercial success. I write separately on this issue to express my view that an invention’s recognition in the related industry and its success in the marketplace, along with the other Graham factors, could constitute strong evidence of innovation which could negate an obviousness finding.
Objective evidence of secondary considerations of patentability are essential components of our obviousness inquiry. Power Integrations, Inc. v. Fairchild, Semiconductor Int’l., Inc., 711 F.3d 1348, 1356 (Fed.Cir.2013) (citing In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation, 676 F.3d 1063, 1076-79 (Fed.Cir.2012)). This is especially true in this modern day of nanotechnology where what may be viewed as a mere incremental step could constitute a great leap in innovation. In order to protect against the prejudice of hindsight bias, courts make factual findings as to factors such as copying, long felt but unsolved need, failure of others, commercial success, unexpected results created by the claimed invention, unexpected properties of the claimed invention, licenses showing industry respect for the invention, and skepticism of skilled artisans before the invention. Power Integrations, 711 F.3d at 1356 (citing In re Rouffet, 149 F.3d 1350, 1355 (Fed.Cir.1998) (collecting cases)). I emphasize that objective evidence of nonobviousness, such as that gleaned from the patented product’s role in the marketplace, is the indicia of the innovation principle upon which rests our system of patents. A major problem I detect in conclusions reached under § 103 is that objective evidence of nonobviousness is too often treated as “secondary considerations.” In my view, objective evidence of nonobviousness is objective indicia of innovation. We must not lose sight that a patent, presumed valid, commemorates an inventor’s achievement that entitles her to full and equal consideration of all evidence before a conclusion on the issue of obviousness is reached.
Our patent laws are designed to foster optimal incentives for innovation, yet too often the genius of an invention is dismissed by combination of known elements viewed through glasses of hindsight. Our cases highlight that inventive contribution often “lies in defining the problem in a new revelatory way.” Mintz, 679 F.3d at 1377; Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1051 (Fed.Cir.1988) (“That which may be made clear and thus ‘obvious’ to a court, with the invention fully diagrammed and aided by experts in the field, may have been a breakthrough of substantial dimension when first unveiled.”). I encourage courts handling patent infringement matters to treat evidence corresponding to the factors identified in Graham as strong, if not the best, evidence of innovation—i.e., the manner in which the industry and the marketplace responded to the disclosure in a patent.
*1376 Here, the ITC succumbed to the bias of hindsight as the record bears significant objective evidence that Apple’s patent was innovative. As a result, the Administrative Law Judge and the ITC were “misled by improper ‘combination’ notions.”[6] Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc., 807 F.2d 955, 960 (Fed.Cir.1986).
As the majority aptly points out, Time Magazine named the iPhone the 2007 “Invention of the Year,” and the publication heralded the touchscreen as a “powerful illusion that you’re physically handling data with your fingers.” J.A. 7483. Similar sentiments were expressed in Bloom-berg Business Week, with an article titled “Apple’s Magic Touch Screen” that specifically refers to Apple’s patent application and describes the screen’s capability “to react to as many as 15 simultaneous touches” as “impressive.” J.A. 7826. These examples—as well as the many others in the record—offer effusive praise relating to the patented invention. Such praise of innovation by the relevant industry weighs against invalidating a patent as obvious. Power-One, Inc. v. Artesyn Tech. Inc., 599 F.3d 1343, 1352 (Fed.Cir.2010).
Evidence of innovation is also found in the testimony and emails demonstrating that Apple’s competitors were copying the claimed technology. See Maj. Op. 1366. The reported success of the patented feature suggests that Apple’s competitors were compelled to ride Apple’s coat tails by expending significant effort to determine how the patentee’s product worked and then altering their own products to conform to the reverse engineered feature. Power Integrations, 711 F.3d at 1369; Akamai Tech. Inc. v. Cable & Wireless Internet Services, Inc., 344 F.3d 1186, 1196 (Fed.Cir.2003). The ITC failed to address the extent to which copying supports Apple’s contention that the claimed touchscreen was integral to its market dominance. These efforts to copy Apple’s claimed technology also weigh against a conclusion of obviousness. See Crocs, Inc. v. ITC, 598 F.3d 1294, 1311 (Fed.Cir.2010) (“Copying may indeed be another form of flattering praise for inventive features.”).
The evidence in this record is a prime example of why we have repeatedly cautioned against assigning inadequate priority to “secondary considerations.” While I agree with the majority’s analysis, I discern the record to contain significant objective indicia of innovation, which in my view, is “the most probative evidence of nonobviousness.” Custom Accessories, 807 F.2d at 960.
Based on the extensive record in this case, I believe Apple overcame significant complexities to produce a touchscreen with desirable optical properties that accurately detected multiple simultaneous touches. Ultimately, it was Apple—not the prior art inventors—who identified the problem, disclosed the steps explaining how the problem was solved, and then created a marketplace for its contribution. By incorporating the invention in the patented products of the iPhone and iPad, Apple’s efforts endowed users around the world with better access to information, more efficient communication, and unparalleled convenience to organize life on the mobile.
For the foregoing reasons, I would reverse the finding that Perski '808 provides adequate written description support for Perski '455 and remand the anticipation *1377 case for additional proceedings as to Apple’s conception date, and whether, based on that date, Perski '455 qualified as § 102(e) prior art. I also would recognize Apple’s technical advances over the SmartSkin reference and find evidence of industry praise, copying, and commercial success dispositive indicators that Apple’s claims were innovative and nonobvious. Accordingly, I respectfully dissent.

. The claimed touchscreen sensors are made out of indium tin oxide (ITO). As implemented in the '607 Patent preferred embodiments, ITO circuitry was masked to the user through caulking ITO channels with clear insulation. '607 Patent col. 12 1. 24 to col. 13 1. 6 and col. 141. 60 to col. 171. 11.

. The language in black remained unchanged between the provisional and non-provisional filings. The language in red represents what appeared in the February 2003 filing of the provisional application, but was removed in the January 2004 filing of the non-provisional application. The language in blue represents additions made in the filing of the non-provisional application. The blue language never appeared in the original provisional application.

. To prove an earlier conception date, Apple must show by clear and convincing evidence that it conceived of the claimed subject matter before its filing date. 35 U.S.C.A. § 102(g)(2); see also Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1577 (Fed.Cir.1996) (“[P]riority of invention goes to the first party to reduce an *1372 invention to practice unless the other party can show that it was the first to conceive the invention and that it exercised reasonable diligence in later reducing that invention to practice.”).

. The fact that a certain thing may result from a given set of circumstances is not sufficient to anticipate because ultimately the prior art "shows what it shows.” Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 639-40 (Fed.Cir.2011) (internal citations omitted). I conclude that "n*m,” by itself, is not an algorithm. What is missing are corresponding steps, such as those added 11 months later.

. The Administrative Law Judge based his obviousness analysis on SmartSkin in combination with Japanese Unexamined Patent Application Publication No.2002-342033A (Rekimoto '033). The ITC disagreed with the Administrative Law Judge that Rekimoto '033 disclosed a relevant use of transparent electrodes. J.A. 523, n. 6. Because I would reverse the ITC's analysis based on the primary prior art reference, I do not discuss the secondary Rekimoto '033 reference.

. The Administrative Law Judge recognized the patented product’s marketplace success but found, among other things, that industry praise, attempts to copy, and commercial success could not overcome the combination of SmartSkin and Rekimoto '033. J.A. 216-17. The ITC adopted the Administrative Law Judge’s reasoning.